IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

| | | |
|---|---|---|
| MERRILL TODD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:12cv589-MHT |
| | ) | (WO) |
| JEROME BAILEY, in his | ) | |
| individual capacity, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

In this excessive-force case, plaintiff Merrill Todd sues defendants Jerome Bailey, Larry Clark, Terry Wood, and Steve Smith, all of whom are law enforcement officers.[1] Todd alleges that defendants beat and tased him and had a police dog attack him. Pursuant to 42 U.S.C. § 1983, Todd asserts that Bailey, Clark, and Wood

---

1. While in the complaint, defendant Terry Wood's last name is spelled "Woods," his lawyers and his declaration refer to him by the last name "Wood," so the court uses that spelling.

violated his constitutional rights by using excessive force against him. They are sued in their individual capacities. Pursuant to Alabama law, Todd also contends that Bailey, Clark, Wood, and Smith committed a battery against him. Jurisdiction for the federal claim is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and the court has supplemental jurisdiction over the state claim pursuant to 28 U.S.C. § 1367.

This case is currently before the court on defendants' motions for summary judgment. For the reasons discussed below, the motions will be denied in part and granted in part. Summary judgment will be denied as to the federal claim against Wood and the state claim against Smith, with these two claims against these two defendants going to trial. Summary judgment will be granted as to the federal claim against Bailey and Clark and the state claim against Bailey, Clark, and Wood, with these claims against these defendants not going to trial.

Because no claims will remain against Bailey and Clark, they will be dismissed as parties.

## I.   FACTUAL BACKGROUND

On August 7, 2010, Todd's family members organized a party at an event space called Club Blaze in LaFayette, Alabama.  Todd arrived at the building early to help set up for the party.  One of his cousins advertised the event on her Facebook page.

Officers from the enforcement wing of the Alabama Alcoholic Beverage Control (ABC) Board learned of the party and staged an undercover operation to determine if alcohol was being sold there without a liquor license, a misdemeanor.  That night an undercover agent reportedly entered the club and was able to purchase alcohol.  Law enforcement then decided to sweep the party in an enforcement action.  A large group of law enforcement officers from the ABC Board, the City of LaFayette, and

3

the Chambers County Sheriff's Department participated in the sweep.  The defendants were among this group.

Todd was in the parking lot in front of the building when he saw a line of law enforcement vehicles arriving. As he had two days left on parole, he decided to leave rather than risk being arrested.  He and his cousin Brandon Story headed towards the area behind the building, with Todd ahead of Story.  As Todd went around the back corner, he saw the headlights of a truck driving towards him from the opposite side of the building.  He started running in the direction of the woods.

The next thing Todd can remember is waking up in the hospital saying defendant Clark's name and seeking a gun. His family members told him that he had been beaten by the police.  Todd surmised that he had been beaten, tased, and bitten by a police dog, based on what his family told him and, later, based on his own examination of his injuries and the clothing he was wearing that night.

4

Paramedics who treated Todd found a one-inch cut above his eye, a bruise on his forehead, bruising and swelling around both eyes, and a 3/4 inch laceration to the side of his left thigh. His treating physician in the emergency room that night found two facial fractures--one to the bone surrounding his left eye and the other on the side of his face by his ear. The doctor described the fracture to the bone around his eye as a "comminuted fracture," Shiver Decl. (doc. no. 53-26) at ¶ 6, which means "splintered or crushed into numerous pieces." Webster's Third New International Dictionary of the English Language 457 (2002). The doctor first assumed that the injury was caused by a beating. Five days later another physician noted the bruising on his face resembled "raccoon eyes." Med. Records (doc. no. 53-31) at 3. Another doctor later concluded he had a concussion.

Two months after the incident, Todd underwent surgery to relieve pressure resulting from an intracranial

hemorrhage in the area where he had been injured that night; burr holes were drilled in his skull. He experiences severe headaches and facial numbness. He also suffers from blurred vision in his left eye, feels sharp pains in the eye, and fears he may go blind.

Since the incident, Todd has had a marked drop in memory. During his deposition he had difficulty remembering what month during the past year he was married in. He stated that he can remember many things before the incident, but he has to try very hard to remember things that happened after it, and it hurts when he tries to do so.

The parties offer two different versions of how Todd sustained his injuries. Defendants contend that Todd's injuries resulted from defendant Smith's accidentally hitting Todd with his truck. Todd argues that his injuries were caused not by the truck, but by defendants' beating him.

A.  Defendants' Version of Events

On the night in question, defendant Smith, a member
of the LaFayette Police Department, drove to the club
with another officer, Jason Fuller, riding as his
passenger.  Their assignment was to catch anyone running
from the back of the club when the sweep began.  They had
come around the back of club when they saw Todd in front
of the truck.  Todd slipped and fell, and then started
to get back up.  Smith swerved to miss him and applied
his brakes, but the truck slid because the field was
strewn with hay.  Smith contended the truck's bumper hit
Todd in the head.  *See* Smith Report (doc. no. 63-3) at
9.

Fuller, who was getting ready to jump out of the
truck when the accident happened, saw Todd slip and fall
but did not see the truck hit Todd.  (He also did not
report hearing or feeling it hit Todd.)  When the truck
stopped, Fuller got out of the truck and saw that Todd

was lying on the ground, bleeding from a cut above his eye, and making a "snoring" sound. Fuller Statement (doc. no. 53-19). He told Smith to call an ambulance. While Fuller was checking him for injuries, Todd woke up and became "combative," trying to stand up and telling Fuller to let him go because he had not done anything. *Id.* Another officer came over, and they decided to handcuff Todd. They searched him for weapons. Then the ambulance arrived.

Defendant Wood, a sheriff's deputy, was one of the first officers to pull into the parking lot. Although he is a canine handler, he says he did not bring his dog that night because the officers were not expecting to find drugs at the club.[2] From inside his patrol car,

---

2. In an earlier interrogatory, Wood admitted to having the dog with him in his truck that night, but maintained that it stayed in the truck during the sweep. *See* Interrogatory (doc. no. 118) at 95. He did not explain the discrepancy between this sworn statement and the statement in his declaration that he did not bring his dog to the sweep.

Wood noticed a man run behind the club and make a motion with his hand as if he were throwing something to the ground. Wood denies pursuing the man. Instead he parked his car and got out, told some people outside the club to lie on the ground, and went inside the club to check on what was happening there. After observing the party-goers lying on the ground inside, he walked back outside to his vehicle to turn off his lights, then walked towards Smith's truck. He saw Fuller kneeling on the ground near a man. Wood recognized the man on the ground as the same person he had seen make the throwing motion. Smith told Wood that he had hit the man with his truck. The ambulance arrived at this point. Wood returned to the general area where he had earlier seen the man make a throwing motion and found a bag of suspected marijuana. He handed the bag to defendant Clark and entered the building through the back door. *See* Wood Decl. (doc. 56-4).

Defendant Clark was inside the club when Todd was injured. Clark was near the back door of the club, about ten minutes after the sweep began, when Wood approached him, gave him the bag of suspected marijuana, and told him about the truck accident. Clark then went outside, saw the ambulance personnel working on Todd, and re-entered the club.

Defendant Bailey reports that he was inside the club when Todd was hurt. He was assigned to get control of the people in attendance and to search and interview them. He went outside after the back door to the club was opened and he saw an ambulance outside.

When he went outside, Bailey was told that Todd had fallen and hit his head on a rock. His statements conflict as to whether a paramedic or Smith told him this: in his initial report on the incident, he wrote that Smith had said it, but he later said that a paramedic did. *Compare* Bailey Decl. (doc. no. 53-10) with Bailey Statement (doc. no. 63-2) at 7. Bailey looked on the

ground, saw that it "was covered in hay and [that] blood was on the ground," and checked for a rock but could not find one in the area. Bailey Statement (doc. no. 63-2) at 7. After making this observation, Bailey (perhaps for a second time) asked Smith what happened, and Smith said that Todd "ran in the path of his truck" and he accidentally hit Todd with his truck. *Id*. Bailey then called the City of LaFayette's police chief to inform him of what had happened and to advise him that the department would need to begin an investigation. After the call, he went back inside the club to assist with processing the people who had been detained.

When the paramedics examined Todd, he was unable to explain how he had been injured, and kept asking what had happened to him. (When the paramedics asked the officers how Todd was injured, the officers said they were unsure.) Todd also could not remember what happened to him when questioned by the emergency room physician later that night. The physician initially surmised that Todd's

injuries had come from an assault, but in a declaration later opined that the injuries were equally consistent with being hit by a vehicle.

## B. Todd's Version of Events

Todd does not dispute that Smith hit him with his truck, but denies that the contact with the truck is responsible for his most serious injuries. He contends that, after the truck hit him and knocked him to the ground, the defendants beat him severely. He also argues that, during that beating, they tased him in the leg and had a police dog attack him.

Because Todd has no eyewitnesses to the alleged assault, his version of events is based entirely on circumstantial evidence. His key evidence is the testimony of Brandon Story, a cousin who saw the truck hit him and contests defendants' version of how and where the truck hit Todd. Story denies that Todd slipped and fell before being hit by the truck or that he was hit in

the head.  Instead, according to Story, Todd was running and upright when the truck hit him in the hip area and knocked him to the ground.  The truck then stopped, but did not hit Todd in the head.

According to Todd, after he was on the ground, the defendants attacked him.  To avoid repetition, the court will discuss the evidence supporting this factual contention in detail below.

## II.  SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant.  For factual issues

to be considered genuine, they must have a real basis in the record." *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996). The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests." *Mize*, 93 F.3d at 743. If the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 745 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

### III.  ANALYSIS

Todd brings a § 1983 claim against defendants Bailey, Clark, and Wood for using excessive force against him in violation of the Fourth Amendment; he brings a state claim of battery against those defendants and Smith.[3] While defendants argue that they are entitled to immunity on the federal and state claims, the motions for summary judgment largely turn on the adequacy of the evidence. The central issue the court must resolve as to both claims is whether there is adequate evidence for a reasonable jury to conclude that Todd was injured due to defendants' intentional acts, rather than--as defendants assert--being accidentally struck by the truck.  Thus,

---

3. Todd initially brought the § 1983 claim against the City of LaFayette and Smith as well.  However, the court granted summary judgment in favor of LaFayette, *see Todd v. City of LaFayette,* 2017 WL 6343309 (M.D. Ala. 2017) (Thompson, J.), and dismissed the claim against Smith on a statute-of-limitations ground, *see Todd v. City of LaFayette*, 2013 WL 6050726 (M.D. Ala. 2013) (Thompson, J.).

the court will first address the adequacy of the evidence, then turn to the immunity issues.

## A. Todd's § 1983 Claim

To establish that a defendant is liable in his or her individual capacity under § 1983, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The § 1983 defendants do not dispute that they were acting under color of state law at all relevant times, and it is clear that they were so acting when they participated in the sweep.

"*[A]ll* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen [are] analyzed under the Fourth Amendment['s] 'reasonableness' standard." *Graham v. Connor*, 490 U.S.

386, 395 (1989) (emphasis in original).[4] "[T]he right to
make an arrest or investigatory stop necessarily carries

---

4. Defendant Smith argued that there is no
evidence that he seized Todd. As Todd's § 1983 claim
against Smith was dismissed, *see supra* note 3, this
argument is moot. In any case, the court notes that,
although Todd was never formally arrested, there is
sufficient evidence for a jury to conclude that he was
"seized" for Fourth Amendment purposes. A seizure occurs
whenever a person is subjected to "governmental
termination of freedom of movement through means
intentionally applied." *Brower v. Cnty. of Inyo*, 489
U.S. 593, 596–97 (1989). *See also California v. Hodari
D.*, 499 U.S. 621, 625 (1991) (ruling that a Fourth
Amendment seizure occurs through mere grasping or
application of physical force); *Tennessee v. Garner*, 471
U.S. 1, 7 (1985) ("Whenever an officer restrains the
freedom of a person to walk away, he has seized that
person."); *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)
(Fourth Amendment seizure occurs when officers have "by
means of physical force or show of authority ... in some
way restrained the liberty of a citizen"). Smith admits
that "his responsibility for the operation was to go to
the back of Club Blaze and prevent the escape of anyone
trying to flee in that direction." Smith Decl. (doc. no.
53-13) at ¶ 6. At the time of the collision, Todd was
trying to flee the club. According to Smith and other
witnesses, Todd was restrained after being hit by the
truck: it is clear that he was seized at that point.
And, of course, if the evidence were to establish that
Smith intentionally hit or beat Todd, that would
constitute a seizure.

with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. at 396. The question is how much force was reasonable under the circumstances the officer confronted. *Id*. at 397. This is an objective inquiry that must be answered "without regard to [the officer's] underlying intent or motivation." *Id*. Answering it "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Jackson v. Sauls*, 206 F.3d 1156, 1169-70 (11th Cir. 2000).

On a motion for summary judgment, the movant has the initial burden of demonstrating that, based on the pleadings, depositions, answers to interrogatories, and admissions, there exists no genuine issue of material fact. Section 1983 defendants Bailey, Clark, and Wood have done so here by presenting Smith's declaration attesting that he accidentally hit Todd with his truck; Fuller's statement describing Todd's injured condition

when he found him on the ground and describing what happened between that moment and when the ambulance arrived; and their and other witnesses' declarations denying that Todd was beaten, tased, or bitten. Therefore, the burden shifts to Todd to demonstrate that there are genuine issues of material fact.

To survive summary judgment, Todd must show that a jury could reasonably infer that Bailey, Clark, and Wood used unreasonable force against him. These defendants argue that Todd has not presented sufficient evidence to show that he was even subjected to a use of force beyond the accidental contact with the truck. The use of force is "an element essential to [Todd's] case, on which [Todd] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, in analyzing the motions for summary judgment, the court will first answer the threshold issue of whether Todd has presented sufficient evidence for a

reasonable jury to conclude that he was subjected to a use of force.

Todd uses several approaches in his effort to prove that the § 1983 defendants used force against him. Primarily, he attempts to do so by demonstrating that the truck could not have caused his head injuries. This argument primarily rests on the testimony of his cousin Story, who saw Todd hit by the truck, and disputes defendants' version of the accident. Todd also offers evidence of additional injuries, which he attributes to being bitten by a dog and shot with a Taser, not to the truck. In addition, Todd seeks to introduce statements of bystanders who said that he was being beaten, and his own statements as to 'flashbacks' of being beaten. Finally, he seeks to show that the sweep was handled in an aggressive manner and that certain defendants are corrupt or have a history of aggressive or violent behavior. Defendants have responded in part with arguments challenging the admissibility of, or asking the

20

court to disregard, much of this evidence.  The court will address these arguments as relevant below.

### 1. Challenges to Todd's Affidavits

Before further discussing the evidence, the court pauses to address the § 1983 defendants' arguments that Todd's affidavits should be disregarded in their entirety.[5]  In response to the motions for summary judgment, Todd introduced affidavits from a number of witnesses.  In general, the affidavits add little to Todd's case.  The affidavits are generally less detailed than the deposition testimony already in the record from the same witnesses.  Nevertheless, as the affidavits do adduce some important facts, the court will address defendants' blanket challenge to their consideration.

---

5.  Defendants made this argument in their motions to strike (doc. no. 70 & 79).  The court denied the motions to strike, but notified the parties that it would consider the arguments raised therein as objections to the evidence as necessary in the opinion on summary judgment.  *See* Order (doc. no. 94).

Defendants argue that the court should disregard all of Todd's affidavits because they were sworn on the basis of "knowledge and belief."  Each affidavit starts with the statement, "I have *personal knowledge* of the facts stated in this statement," but concludes with the following:  "I swear or affirm that the statements contained herein are true and accurate to the best of my knowledge *and belief*."  *See* Pl.'s Evidentiary Submissions (doc. no. 63-1) (italics added).

Federal Rule of Civil Procedure 56(c)(4) provides: "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Defendants argue that, because the affidavits are not sworn on the basis of knowledge alone, they cannot be considered under Rule 56.

Defendants cite a number of cases in support of their

argument, but none is on all fours with this case. In all but one these cases, the courts addressed whether a particular statement within an affidavit or declaration could be relied upon when the declarant explicitly stated that he 'believed' certain facts to be true. For example, in *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), the court found that a statement in a sworn affidavit that the affiant "believe[d]" that he had seen a particular action was insufficient to create a dispute of material fact sufficient to withstand summary judgment as to that issue. The court carefully analyzed each statement in the affidavit, breaking down which parts of each statement were based on knowledge and therefore could be relied upon, and which parts were based on belief and therefore could not be considered. *Pace* counsels that courts should take a statement-by-statement approach to analyzing whether statements in an affidavit are based on personal knowledge, and should disregard only those that lack such a basis. *See also Stewart v. Booker T.*

*Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000)
(plaintiff's statement that, "on information and belief,"
defendants "knew" before transferring her to a new
position that the position would be eliminated could not
create a genuine dispute of material fact because
plaintiff lacked personal knowledge).  In sum, *Pace* and
the similar cases cited by defendants dealt with whether
courts should rely on particular statements in
declarations, rather than declarations as a whole.

The closest case cited by the defendants is *Fowler
v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150 (5th Cir. 1965).[6]
There, after plaintiff sued defendants in state court for
illegally wiretapping her, defendants removed the case
to federal court and stated in their verified removal
petitions that they were federal officers acting within

---

6.  In *Bonner v. City of Prichard, Ala.*, 661 F.2d
1206, 1209 (11th Cir. 1981) (en banc), the Eleventh
Circuit Court of Appeals adopted as binding precedent all
of the decisions of the former Fifth Circuit Court of
Appeals handed down prior to the close of business on
September 30, 1981.

their duties and thus were immune from suit.  The district court treated the defendants' removal petitions as motions for summary judgment and dismissed the case on the basis of immunity.  The appeals court "h[e]ld that defendants failed to establish that there was no genuine issue of fact ... [because] the bare, conclusory allegations of the removal petitions, stating generally that [defendants] were acting within the scope of their employment and under color of office, were inadequate for this purpose. These allegations were legal conclusions unsupported by facts." *Id*. at 153–54.  The court further observed that the verified petition was insufficient because "verification must be on personal knowledge alone, whereas these petitions were verified only on 'knowledge, information and belief.'" *Id*. at 154. However, this general and conclusory observation was not necessary to the holding, and accordingly is dictum.

In *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015), the Sixth Circuit Court of Appeals explained

its preferred approach for district courts to take when faced with affidavits sworn based on 'knowledge and belief.' "When affidavits based on knowledge and belief are submitted to support or oppose a motion for summary judgment, the district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit. If the court can distinguish between the two, then ... the court should excuse the affiant's stylistic error, and must admit the parts based solely upon personal knowledge, while striking the parts based upon belief. If the court cannot differentiate between the two, then ... the court must strike the affidavit in its entirety ...." *Id. See also* 10B Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2738 (4th ed. 2017) ("Where the affidavit includes both competent and incompetent evidence, the Court should disregard the incompetent evidence but give full consideration to that which is competent. ... This is nothing more than the procedure which would be followed

at trial. The Court would not strike the entire testimony of a witness merely because a portion of his testimony is incompetent. The same rule is to be applied to supporting affidavits.").

The court finds the Sixth Circuit's approach persuasive and consistent with the Eleventh Circuit's approach in *Pace*, and is not inclined to disregard Todd's affidavits as a whole for several reasons. First, because each affidavit contains a sworn statement that the facts are based on personal knowledge, it is possible that the reference to 'knowledge and belief' was a careless stylistic error by Todd's original counsel. Second, because the affidavits frequently make quite clear which statements are or are not based in personal knowledge, the court can easily disregard the improper statements without discarding the entire affidavits. For example, in his affidavit, Todd explicitly summarizes information others witnesses told him about the relevant events; the court can easily ignore such statements in

deciding the instant motion. Third, each of the relied-upon affiants was deposed; the availability of deposition testimony offers the court an additional basis for judging whether the affiant's statements were based on personal knowledge or belief.

For these reasons, defendants' objection to the consideration of Todd's affidavits as a whole is overruled. However, the court will disregard all statements that are not based on a personal knowledge. As for defendants' other objections to various statements in the affidavits, the court will take those up as relevant below.

## 2. Evidence of Use of Force

As evidence that he was subjected to a use of force, Todd relies on the testimony of Story to show that Smith's explanation of how he sustained his injuries is not accurate. He also argues that he suffered injuries that could not have been caused by the contact with the truck

described by Smith.  The court will discuss that evidence before turning to the other evidence in the record potentially supporting his argument.

### a. Story's Testimony

At base, Todd's contention that his injuries came from an intentional use of force rather than the truck relies on the testimony of Story, for Story is Todd's only witness who can testify to what happened when Todd was hit by the truck.

In his deposition, Story testified that he saw the truck hit Todd "from his hip side" and that it "knocked him on the ground."  Brandon Story Dep. (doc. no. 56-8) at 10.  He denied that Todd slipped and fell before the truck hit him.  He also testified that the truck did not hit Todd in the head and that the truck stopped shortly after hitting Todd.

This testimony alone creates a genuine dispute of material fact as to whether Todd's injuries stemmed from

a use of force by law enforcement.  As discussed above,
defendants attribute Todd's serious head injuries to his
being hit in the head by the bumper of Smith's truck as
he started to stand up after slipping and falling.  If,
as Story testified, Todd did not slip and fall, and the
truck hit Todd in the hip and not in the head, then
something else must have happened to Todd's head.  It is
undisputed that from the time Todd was hit by the truck
until the ambulance took him away, the only other people
behind the club with him were law enforcement officers.
If a jury were to credit Story's testimony, it could
conclude that Todd probably was injured by a use of force
by those officers, because there is no other explanation
for Todd's broken skull.

Other aspects of Smith's explanation could lend
support to this conclusion.  Evidence suggests that Smith
offered a number of differing explanations for how Todd
was injured.  First, he stated that Todd fell and hit his
head on a rock.  *See* Bailey Statement (doc. no. 63-2) at

7 ("I then asked Sgt. Steve Smith what had happen[ed] and he told me that Merrill was running and felled on the ground and hit a rock."). When confronted with the lack of evidence supporting that explanation, he changed his story to say that he accidentally hit Todd with his truck after Todd ran in the truck's path. *Id.* And when the paramedics arrived to treat Todd, the officers did not tell them about a truck accident at all, instead saying they did not know how Todd was injured. A reasonable jury could infer that if Todd truly were injured accidentally by the truck, the officers would have told the paramedics about it, as that information could affect the medical care he received, and that they did not mention the contact with the truck because they were covering up something worse--like a beating. A jury could rely on Smith's changing story and the officers' lack of forthrightness to conclude that Smith's contention of hitting Todd in the head with his truck is not worthy of belief.

### b. Evidence of Other Injuries

Todd relies on evidence of other injuries to his body as proof that he was subjected to a use of force. Smith's declaration purports to explain only Todd's head injury. However, Todd has presented evidence that he suffered injuries to other parts of his body as well, and that his clothes were damaged during the incident. In his response to summary judgment, Todd argues that these injuries are attributable to defendants' using a Taser on him and having a police dog bite him. As discussed below, Todd has not submitted sufficient competent evidence at this time for a jury to conclude that he was tased and bitten; but, regardless of whether the injuries were caused by a Taser or a dog or a beating, these injuries are still relevant evidence. Because defendants' evidence does not explain Todd's other injuries, a jury could still rely upon the description

of the injuries as additional support for a finding that, more likely than not, Todd was beaten by law enforcement.

Todd presented evidence that he suffered an unexplained wound on his upper thigh during the incident. The paramedics noted the laceration in their examination of him and that Todd complained of pain there. There also evidence that defendant Clark had a Taser with him on the night in question and threatened to use it on another individual. Clark Statement (doc. no. 63-2) at 5.[7] However, this evidence is clearly insufficient to prove that Todd was tased.

---

7. The record does not make clear whether Smith had a Taser that night as well, although it appears he may have. Smith admitted that he was certified to use a Taser, but did not deny having one with him on the night in question; however, he did deny that anyone used a Taser on Todd that night. *See* Smith Decl. (doc. no. 53-15). In addition, while the LaFayette police chief specifically stated that his employees Clark and Bailey would not have a Taser with them that night because they were employed as investigators, he did not deny that his other employee Smith would have had one, and Smith was not employed as an investigator. *See* Vines Decl. (doc. no. 53-15).

Todd also offers his own opinion that he was tased
and his description of his injury.  In an affidavit, Todd
stated, "I know I was tased because I have the mark that
the taser left on my body and the taser burned my boxers."
Todd Aff. (doc. no. 63-1) at 1.  In the cited parts of
his deposition, Todd offered his opinion that he had been
tased, and testified that he had a "taser mark" on his
leg, got stitches there, and that his boxers were "burnt
up."  Todd Dep. (doc. no. 56-1) at 185:6-13.  Todd's
opinion that a Taser caused both the mark on his leg and
the apparent burn on his boxer shorts is not admissible
on the current record.  Todd did not testify to any
specific aspects of his wound or the details of the
apparent burn on his shorts that allowed him to identify
the source as a Taser; nor does the evidence suggest that
he has the type of experience with Taser wounds that
might allow him to offer an admissible lay opinion.
Instead, it appears that his opinion is based on
speculation and belief.  Accordingly, the court will not

consider his opinion.  That said, his testimony that he had a wound on his leg, that he received stitches, and that his boxer shorts appeared to be burned is admissible evidence.[8]

Todd also points to his cousin Naya Robinson's testimony about a wound she saw on Todd's body that she believed was caused by a Taser.  In her deposition, she described the wound as follows:

> "A. It's like a little straight -- kind of like a -- like a bruise, like a burn mark, like a burnt mark, kind of like -- like going like this (indicating).

---

8. Todd's deposition testimony that his shorts had what he believed to be a burn on them, while certainly curious, falls short of proving that he was burned by a Taser.  The offered testimony is not detailed enough to assess whether the purported burn could have come from a weapon: for example, he does not make clear whether his shorts were burned in a particular location or in large part, or whether there was a hole in the fabric or simply discoloration.  The apparent burn on his shorts might have been caused by a Taser, and there is evidence in the record that Clark had a Taser with him on the night of the sweep and that Smith was certified to use a Taser and may have had one with him, *see supra* n.7.  Nevertheless, it would be speculation to reach the conclusion that Todd was tased based on the current record.

"Q. Okay. And you're -- you're holding your fingers about an inch apart; is that right? Was it that big or was that -- what did you mean by that?

"A. Yeah, I guess it was -- it was kind of big, about that size. It was just going across.

"Q. So it was a -- a line?

"A. Not -- not just a straight line. Like a -- like a bruise, like -- looked like from a taser mark."

...

  "Q. Okay. Was it an open wound? Was it a cut or was it just a bruise?

"A. It was open.

...

"Q. How long was that opening in his skin?

"A. I'm not sure how long it was.

"Q. Was there one opening or were there two openings?

"A. I want to say two -- two -- it looked like two openings.

"Q. And how far -- how far apart were those two openings?

"A. That -- they wasn't that far apart.

"Q. And was each opening the same length, each cut the same length?

"A. I want to say so, yes.

"Q. And how -- how long were those two cuts?

"A. I'm not sure how -- exactly how long it was.

"Q. Was it more than an inch?

"A. No.

"Q. Okay. How far apart were the two cuts?

"A. They wasn't that far apart.

Robinson Dep. (doc. no. 56-7) at 49:23-51:18.  In her affidavit, Robinson stated that Todd had an "open wound" from the Taser.  Robinson Aff. (doc. no. 63-1) at 11.

A lay witness's opinion testimony is admissible when it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Under Rule 701, "the opinion of a lay witness on a

matter is admissible only if it is based on first-hand knowledge or observation." *United States v. Marshall*, 173 F.3d 1312, 1315 (11th Cir. 1999).

"When a lay witness has particularized knowledge by virtue of her experience, she may testify--even if the subject matter is specialized or technical--because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009). When presented such testimony, "[a] trial judge must rigorously examine the reliability of a layperson's opinion by ensuring that the witness possesses sufficient specialized knowledge or experience which is germane to the opinion offered." *Id.* at 83. Additionally, a layperson whose opinion is *not* based on such particularized experience "may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *Doddy v. Oxy USA,*

*Inc.*, 101 F.3d 448, 460 (5th Cir. 1996) (citation omitted).

Robinson based her opinion on having seen a Taser wound prior to seeing the wound on Todd. Robinson did not explain the circumstances under which she saw the prior Taser wound: whether she saw it once for a few seconds or repeatedly over a longer period, or how she knew it was a Taser wound. Robinson also did not testify to what made Todd's wound identifiable as a Taser wound, or even explain how the wound she saw on Todd was similar to the wound she saw before. In light of the lack of explanation, Robinson's prior viewing of a Taser wound does not provide a sufficient basis in personal knowledge to offer an opinion. Acting as the gatekeeper for evidence, the court concludes that Robinson's opinion testimony is inadmissible on the current record.[9]

_____

9. The court makes no ruling on its admissibility at trial with a proper foundation.

That said, Robinson's testimony describing the injury would be admissible in evidence at trial.[10]  It is

_____

10. In response to the motions for summary judgment, Todd also submitted a photograph of an open wound.  *See* Photograph (doc. no. 63-2) at 1.  This photograph is disturbing.  It appears raw and open, with two apparent holes within the open area.  It is unclear how Todd could have received this injury based on defendants' explanation of how he was injured.

Todd submitted no testimony or affidavit explicitly identifying this photograph or explaining whose wound is in the photo.  However, he referred to the exhibit in his brief after mentioning the Taser wound, *see* Pl's Resp. (doc. no. 60) at 5, and submitted with the photograph the affidavit of Naya Robinson attesting that she had taken some photographs of Todd's wounds, *see* Robinson Aff. (doc. no. 63-1) at 11.  During her deposition, Robinson testified that she had taken photos of Todd's wounds that she had not been able to find by that date.  Based on Robinson's affidavit and deposition testimony, it appears likely that she took the photograph and found it after her deposition.

Defendants argue that the court should not consider the photograph because it was not properly authenticated, and because Todd did not produce it in discovery.  On the assumption that the photograph was taken by Robinson, Todd could authenticate it at trial; therefore, the court need not exclude it on that ground.  As for the discovery argument, the court need not address it, because the photograph is cumulative at summary judgment given Robinson's statement that Todd had an open wound and her description of the wound.  Thus, the court does not

difficult to envision how Todd could have received the described injury from slipping and falling in a field of hay and being hit in the head by the truck. Although it is not conclusive or sufficient on its own to conclude that Todd was beaten, a reasonable jury could find this evidence to support his contention that he was subjected to a use of force.

Defendant Wood argues that Todd's proposed inference that he was beaten is unreasonable in light of the fact that his testimony is 'directly contradicted' by the objective medical evidence. *See* Wood's Reply Brief (doc. 73) at 5. He argues that Todd did not suffer any documented injuries to his hip, as one might expect were he hit by the truck in the hip as Story says, so no reasonable jury could believe his version of events. Wood cites to *Scott v. Harris*, 550 U.S. 372 (2007), in

---

consider the photograph here. Defendants are free to re-raise their objections to the photograph in a pretrial motion, and the court will address the discovery objection at that time.

which the Supreme Court reversed the denial of summary judgment where the plaintiff's evidence was contradicted by a videotape in the record showing that he engaged in a dangerous, high-speed chase, contrary to his contention.  The Court explained: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id*. at 380.

The record here is not nearly so contradictory as in *Scott*.  There is no videotape showing what happened to Todd.  Moreover, the medical record is far from complete or conclusive.  While defendants submitted with their motions a number of medical records from Todd's treatment after the incident, documenting various follow-up treatments he received for his head injury, they have not submitted perhaps the most crucial records: those from the hospital he was taken to immediately after he was

injured and where he stayed until the following day. Thus, the court does not have before it a complete body chart or record carefully cataloguing all of Todd's injuries.[11]  Instead, defendants have simply submitted a conclusory declaration from a treating physician stating that he did not see any injuries on Todd consistent with a Taser or dog bite and that while he initially assumed that Todd was assaulted, his injuries were equally consistent with a vehicle accident.  However, the physician, who is certified in internal medicine, did not explain the basis for his opinion; nor did he state that he has experience identifying Taser wounds, dog bites, or accident injuries.[12]  Because the declaration does not

---

11. The paramedics' report is the closest thing to a complete record, but given that it was based on a field examination under less than optimal conditions, the court does not consider it conclusive.

12. He may very well be able to show an adequate basis for his lay opinion at trial.  However, he has not done so here.

adequately establish the basis for the physician's opinions, those opinions are not helpful, and the court will not consider them on summary judgment. *See* Fed. R. Evid. 701.[13] Moreover, the physician's declaration--that Todd's injuries *could* have been caused by a vehicle--is

---

13. The court also did not consider another physician's diagnosis of Todd's wound as having been caused by a Taser. *See* East Alabama Medical Center Discharge Summary (doc. no. 53-32) (listing discharge diagnosis of "laceration to left thigh secondary to Taser during altercation").

The court did not consider the record as proof that Todd was tased because the opinion of the physician--who was not qualified as an expert--as to the cause of the injury is not admissible. *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (explaining that while physician's diagnosis of injury is admissible, her testimony as to cause of injury was not because it was a hypothesis, and "the ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses.") (citation omitted)). In any case, it appears that the doctor may have been simply repeating what Todd told him. *See East Alabama Medical Center Discharge Summary* (doc. no. 53-32) ("He had been at a club, by his history, and ... had an altercation with facial head injury and laceration to his left thigh were (sic.) a taser was applied.").

not inconsistent with Todd's contention that the law enforcement officers beat him.

While it is curious that Todd has no documented injury to his hip, it is certainly possible that he received only a glancing blow, or that the medical providers focused on his most serious injuries and complaints--those to his head and leg.  Thus, the court finds that a reasonable jury would not necessarily reject Todd's claim based on the medical records before the court.

In addition to the leg wound, Todd testified to injuries to his ankle and damage to his boots and hat. During his deposition, Todd described the unexplained injuries and clothing damage as having been caused by a dog.  He explained: "[M]y ankle was cut, my boot was cut....  Then my boot was busted up. Then I got the dog print in my hat. It tore my button off my hat, but it tore the thread off. But the teeth print still in my hat. And I kept--well, on my pictures, when--I kept grabbing

my head on one of my pictures. But I ain't got it to show y'all. And it had my head in the back or something...." Todd Dep. (doc. no. 56-1) at 179:16-180:8; *see also id.* at 188:8-190:11.

Todd argues that these injuries were caused by a police dog. As proof that he was bitten, Todd offers testimony of a witness who heard a dog growling in the area where he was hit shortly after he was hit, defendant Wood's admission that he was a canine handler, his own and his family members' opinions that he had a dog bite on his body, and his description of his injuries.

Story testified that, very soon after being confronted by Wood, he heard what sounded like a dog growling and biting on something, coming from the direction where Todd had been hit. *See* Brandon Story Dep. (doc. no. 56-8) at 91:16-92:22. As defendants point out, and Todd does not contest, because the club was located in a rural area, any number of dogs could have been nearby; even if Story did hear a dog, his testimony

does not prove that he heard a police dog. That said, Story's testimony could provide some corroboration for Todd's contention that he was bitten by a dog.

Todd's opinion testimony that he was bitten by a dog does not meet the requirements for lay opinion testimony because it provides no basis for the court to conclude that the opinion as to the cause of his injuries "could be reached by any ordinary person." *Doddy,* 101 F.3d at 460. In ordinary circumstances, laypeople are not called upon to identify wounds as dog bites in the absence of information that a dog caused the bite. Usually, the person who was bitten was conscious when it occurred and can say what happened to him; the layperson proceeds on the basis of that report. That said, there are situations in which a layperson without such second-hand information could identify a wound as a dog bite. For example, one could identify a bite based on its shape: a group of bleeding wounds in the arrangement of a triangular, non-human jaw would allow a layperson to conclude that a

person was probably bitten by a dog or other animal.  A
lay witness might also be able to identify a dog bite on
the basis of experience receiving, viewing, or treating
such bites.

However, none of these circumstances is present in
the evidence before the court at this time.  Todd has not
submitted any evidence showing that his wounds appeared
in such a way that an "ordinary person" could readily
identify them as bites. *Doddy*, 101 F.3d at 460.  Instead,
he merely called them "dog prints" or "tooth prints" but
did not describe their appearance.  Nor has he produced
evidence that his opinion or that of his relatives was
based on experience with dog bites.   As a result, the
court will not consider the lay opinions that Todd was
bitten by a dog on summary judgment.[14]

---

14. Todd's affidavit statement on this matter
suffers from the same flaw.  There he simply stated, "I
know that I was bitten by a dog because there were bite
marks on my clothes and body."  Todd Aff. (doc. no. 63-1)
at 1.

Similarly, Todd's descriptions of his injuries and the condition of his clothes after the incident are too general to prove that he was bitten by a dog. His statements that his ankle was "cut" and his boot were "cut" and "busted up," that the back of his head hurt, do not show that he was bitten by a dog. As to his clothes, his testimony establishes that a button was almost torn off the hat he had been wearing, and that there was some kind of "print" on the hat. Because he does not describe what he calls the "dog print" or the "teeth print," the court is left to guess what the print looked like. Based on his testimony, a jury could not reasonably infer that this damage was the result of a dog.

Nevertheless, this evidence, considered alongside the leg-injury evidence, Story's testimony, and Smith's inconsistent explanations could provide a sufficient basis for a jury to conclude that Todd was subjected to a use of force by law enforcement: if Todd were hit by

the truck only in the head, and fell in an area with no rocks, it is unclear how his Timberland boots and ankle could have been cut. Because there is no other apparent cause for this damage, the jury could conclude that it was probably caused by a use of force.

### c. Testimony as to Overhead Statements

The court has been presented with testimony that various people said that Todd was being beaten during the raid on the club. These statements are inadmissible.

Todd attempts to rely on the statement of Story's brother that at the club Mike Petrey, a former defendant in this case, "was talking about that [Todd] was beat up by officers outside, but that was what another cop was saying at the club." Bryant Story Aff. (doc. no. 63-1) at 7. This statement is hearsay, as it is an out-of-court statement by someone other than the witness offered to prove the truth of the matter asserted: that a beating was taking place outside of the club. Indeed, it is

double-hearsay, as Story is attesting to Petrey's statement, and Petrey is attesting to the unnamed officer's statement. Todd argues that the statement is admissible both under the exception to the hearsay rule for a present-sense impressions, *see* Fed. R. Evid. 803(1), and under the exclusion from the hearsay rule for statements by party opponents, *see* Fed. R. Evid. 801(d)(2).

Rule 803(1) allows for the admission of "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Story's brother's statement does make clear whether the unnamed officer's statement was made while or immediately after he or she perceived the alleged beating, so Rule 803(1) does not apply. However, even if the unnamed officer's statement were a present-sense impression, Todd must still show that Petrey's statement was admissible. Rule 803(1) does not apply to Petrey's statement: he did not describe an event or condition he

was perceiving, but instead merely repeated what another officer said. Furthermore, as Petrey is no longer a party in this case, Rule 801(d)(2) has no application here. Thus, Petrey's statement is inadmissible. Similarly, Story's brother's testimony recounting that a mutual friend of his and Petrey's told him that, during a phone call, Petrey told the friend that officers had "just beat the F out of Merrill Todd" is inadmissible. Bryant Story Dep. (doc. no. 56-13) at 40:1-41:15.

Terrence Bledsoe's testimony is inadmissible as well on the current record. Bledsoe was in the club when a group of officers came through the front door of the club and ordered everyone to get down on the ground. While on the ground, he saw the back door to the club open, after which he heard another detained individual state, "they're beating Merrill up in the back." Bledsoe Dep. (doc. no. 56-12) at 24:22-25:2. Bledsoe explained that "when they said it, they were, like, they jumping on him." *Id.* at 23:1-3.

Bledsoe's statement is inadmissible unless an exception to the hearsay rule applies. Federal Rule of Evidence 803 exempts from the hearsay rule "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." However, taking the evidence in the light most favorable to Todd, the court cannot draw the inference that the person who made this statement saw, or was even a position to see, whatever was happening to Todd through the open rear door to the club, for there is nothing in the statement to suggest such.

### d. Evidence of Beating Sounds

Story attested that he "heard something that sounded like someone getting beat up behind the club, but I couldn't actually see anything." Brandon Story Aff. (doc. no. 63-1) at 5. Defendants object to the

consideration of Story's statement that he heard a sound of a beating because they contend it is a sham.[15]

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). In such a circumstance, a court may disregard such affidavit as a sham. *Id*. However, the sham-affidavit rule "is applied 'sparingly because of the harsh effect [it] may have on a party's case.'" *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth,* 833 F.2d 1525, 1530 (11th Cir. 1987)). Courts must distinguish "between discrepancies which create

---

15. The statement, if true, is based on personal knowledge, so the court will not disregard it on the basis of defendants' general objection to consideration of statements based on belief.

transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir. 1986). "[E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." *Id.* at 954 (citation omitted). Therefore, the court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Allen,* 495 F.3d at 1316 (citation omitted).

Defendants argue that Story's affidavit directly contradicts his deposition testimony. To understand this testimony, it is important to note that Story testified that he first went around to the back corner of the building, which was labeled position "one," then came

back in front of the building, to positions labeled during the deposition as "two" and "three."

> "Q. Okay. Well, tell me what you heard or saw when you're over there around the--at either the number two or number three position.
>
> "A. I really didn't get a chance to hear anything because there was so much commotion going on in the number two position and three, but the officer was telling me to get up. I heard the ambulance going toward the back, or I saw the ambulance going to toward the back."

Brandon Story Dep. (doc. no. 56-8) at 72:3-73:11.

This testimony does not contradict his affidavit. Story's affidavit speaks to what he heard immediately after seeing Wood run towards the back of the club towards Todd, when he was walking from position one, at the rear corner of the club, to position two, in front of the club. This deposition quote speaks to what he heard when he had already moved to the front of the building, and therefore is not contradictory.

Defendants also argue that, while he was near to where he saw Todd struck, he only testified to hearing a dog growling.  Story testified as follows:

"A. The truck came up and hit him.

"Q. Okay.  So you saw that.  What happened next?

"A. That's when Terry Wood told me get--he came back to the--around to the back, told me to get on the ground.

"Q. Okay.  And then you refused; right?

"A. No.

"Q. You didn't refuse?

"A. I told him that it was muddy.  He told--he kept going.  He kept going--

"Q. Okay.  He said--

"A. --after I told him that--

"Q. --get on the ground.  You said, No, it's muddy, and then he ignored you and went around to the back?

"A. Yeah.

"Q. And then you--

"A. I heard a dog growling.

"Q. Where was the dog?  Did you see--

"A. In the--

"Q. --a dog?

"A. --back.  No.

"Q. You didn't see a dog?

"A. Nope.  I heard it.

"Q. Okay.  Where'd you hear the dog from?

"A. When I was walking back."

Brandon Story Dep. (doc. no. 56-8) at 47:9-48:13.  When much later in the deposition another party's attorney asked him whether he had provided every detail, Story testified that he had provided all the information he had.  That discussion went as follows:

"Q. I've got just a few questions. I'd like to follow up some things Mr. Webb asked you. Have you told him pretty much everything that you know or saw about what happened out at the Club Blaze that night?

"A. Yes, sir.

"Q. Is there anything else you think of that he hasn't asked you about, any detail about what

happened or anything like that that you haven't gone over already and told us about today?

"A. No, sir.

"Q. You can't think of anything else at all?

"A. No, sir."

*Id.* at 86:14-87:6.

The purpose behind the sham-affidavit rule is to stop unethical litigants who intentionally file a misleading affidavit to defeat summary judgment. It is designed to be used when an attorney has asked a specific, direct question that goes to an important fact, the witness has answered that question one way during a deposition, and then submits an affidavit that directly contradicts his deposition answer. It is not to be used as a trap for the witness who does not volunteer a detail he might have shared if asked an additional, different, or direct question, or who due to the stress of questioning fails to recall a particular fact. It should not be used as a memory test. Catchall questions such as "have you told

me everything you remember?" present just such a trap, particularly when used long after the original questioning. An honest witness under the stress of examination may legitimately forget to share a particular detail in recounting an event or series of events, and should not have his testimony excluded because, when no longer under such stressful conditions, he remembers an important detail and wishes to share it. Whether the witness legitimately forgot the detail is an issue to be explored on cross-examination and to be decided by the jury--not to be resolved by the court through exclusion. For this reason, the sham-affidavit rule should be used very rarely and only with extreme caution. *See Allen*, 495 F.3d at 1316.

Defendants' questions were not the kind of unambiguous, direct questions that call for application of the sham-affidavit rule. Defendants did not ask Story whether the dog growling was the *only thing* he heard when he was walking away from where Todd had been hit.

Instead, a lawyer merely prompted him to give a narrative of what he remembered and frequently interrupted him during the questioning. Given the frequent interruptions, it is not at all clear that Story was able to get out the entire story. As for the general catchall questions, they were asked by a different party's attorney much later in the deposition. It is entirely unsurprising--indeed, it is to be expected--that Story would not recall everything he had or had not said under hours of intensive examination. While defendants can certainly attempt to use Story's answers to those catchall questions in an effort to impeach him on cross-examination, the court will not strike the challenged statement under the sham-affidavit rule.

### e. Evidence as to the Course of Events

Todd presented evidence that, during the raid, an officer grabbed a woman by the neck and threw her on the ground because she did not respond immediately to his

request to get on the ground.  Defendants argue that the court should not consider the evidence because it is irrelevant and far more prejudicial than probative.  The court disagrees.

Kadesha Russell, who was sitting in a truck in the parking lot in front of the club when the sweep began, testified that an officer whose name she does not know used force against her.  She testified that, when she hesitated before getting on the ground, the officer picked her up by the neck, slammed her to the ground, and yelled "get down bitch!"  Russell Aff. (doc. no. 63-1) at 9.

Defendants argue that the evidence as to Russell's alleged mistreatment should not be considered because it is irrelevant and far more prejudicial than probative. The court disagrees.

The record contains substantial evidence that the raid was carried out in an aggressive manner.  The focus of the raid was the sale of alcohol without a license, a

misdemeanor offense.  Prior to starting the raid, the police sent in an undercover officer to confirm that alcohol could be purchased at the club.  Instead of simply obtaining a warrant to arrest the persons selling alcohol at the club, they assembled a large group of officers from several jurisdictions and raided the club in a massive show of force late at night.  Upon arrival, officers began jumping out of the trucks before they even came to a stop.  Defendant Smith took his truck and sped around the back of the building in an effort to catch anyone who might be fleeing from the scene of this misdemeanor liquor-sale bust.  The officers ordered everyone to lie down outside on the dirt and inside the club.  Witnesses attested that several officers were seen carrying large guns or shotguns, as opposed to handguns.  Wood reportedly pointed a large gun in Story's face as he ordered him to the ground.

Defendants did not appear alone that evening but were, instead, acting as part of an overall operation.

Their conduct can be correctly and fully understood and appreciated only if it is seen in the context of that overall operation. A picture of the overall operation is, therefore, a "fact ... of consequence in determining" Todd's claim. Fed. R. Evid. 401. At trial, Todd would be entitled to show the overall manner in which the raid was effected, including the details of the course of events that unfolded. Defendants contend that the evidence of Russell's treatment is irrelevant because it did not involve the same officers who allegedly beat Todd. However, what happened to Russell is part of that course of events and would be one of the many details, including those given in the previous paragraph, to support the drawing of the overall picture of the manner of the raid.

Defendants argue that this evidence is, nevertheless, unduly prejudicial. *See* Fed. R. Evid. 403. The rules of evidence allow relevant evidence to be excluded if "its probative value is substantially

outweighed by a danger of ... unfair prejudice."  *Id*.
The Eleventh Circuit views exclusion as "an extraordinary
remedy which should be used only sparingly since it
permits the trial court to exclude concededly probative
evidence"; "the balance ..., therefore, should be struck
in favor of admissibility."  *United States v. Fallen*, 256
F.3d 1082, 1091 (11th Cir. 2001) (quoting *United States
v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992)).
Here, this court does not find that the probative value
of Russell's testimony is substantially outweighed by a
danger of unfair prejudice.[16]

---

16. Moreover, there are a number of possible
curative instructions that the court could develop with
the input from the parties.  For example, the court could
possibly instruct the jury that they should consider the
testimony as to the treatment of Russell only in
determining the manner in which the sweep was conducted
overall, and that they may not simply assume that because
one officer behaved in a violent manner, the defendants
did as well.

### 3. Evidence Tying Defendants to the Use of Force

While Todd has presented sufficient evidence for a jury to conclude that his injuries probably stemmed from a use of force, to survive summary judgment in favor of a defendant, he must also tie that evidence to that particular defendant.

Defendants own evidence shows that at least one officer did use force against Todd: Jason Fuller. Fuller admittedly tried to restrain Todd, and when he resisted, put him in handcuffs. When the ambulance came, the paramedics came upon Todd face down on the ground and handcuffed, with officers searching him. When they rolled him over, he was bleeding from the head.

This, of course, is not sufficient. There must be sufficient evidence for a reasonable jury to conclude that one or more defendants used unreasonable force against him. However, "'[i]t is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section

1983.  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) (quoting *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985)).  Thus, Todd must submit evidence as to each defendant sufficient for a jury to conclude that either (a) the defendant used force against him or (b) he failed to intervene to stop another officer's use of excessive force.  *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000) ("We have previously said that an officer can be liable for failing to intervene when another officer uses excessive force.").  Liability for failure to intervene, however, arises only "when the officer is in a position to intervene and fails to do so." *Id*. at 924-25 (citation omitted).

Thus, the court must examine whether the evidence is sufficient to conclude that Wood, Clark, and Bailey

either used force against Todd or were in a position to
intervene to stop other officers from using excessive
force against him but failed to do so.  Because, as to
the § 1983 defendants, the evidence is sufficient only
as to Wood being present during the time that Todd was
allegedly beaten, the § 1983 claim may proceed only as
to him.[17]


### a. Wood

In his response to the motions for summary judgment,
Todd did not explicitly argue, except perhaps by
implication, that Wood beat him.  Instead he simply
argued that he was beaten, tased, and bitten by a dog
without saying which defendant was responsible for his
injuries.  However, he did supply significant evidence
in opposition to summary judgment that calls Wood's story
into question.

_____

17.  As explained earlier, the § 1983 claim against
Smith was previously dismissed. *See supra* n.3.

In his declaration and statement, Wood offered the following version of events. He stated that as he pulled into the parking lot, he saw a person running around the right side toward the back of the building, trained his spotlight on him, and saw the man "make a motion with his right hand while running as if he was throwing something." Wood Decl. (doc. no. 56-4) at 3. Wood then parked his car in the front of the building and instructed people to lie down. He went into the building through the front door, walked outside to turn off the lights on his vehicle, saw Smith's truck parked behind the building, and walked behind the building. There he saw Fuller on one knee with a person on the ground; Fuller was telling the person on the ground to lie still and that an ambulance was on the way. Wood stated, "I realized that the person on the ground was the same person who I had seen running when I first arrived at Club Blaze, but I did not identify him as Merrill Todd at the time." *Id.* He continued: "I then examined the ground where I

knew the person had run and found a bag of marijuana.  I suspected that getting rid of the bag of drugs had been the person's motivation for running from the club."  *Id*. at 4.  He then went to the back door of the club to turn the marijuana in and went inside the club.  Wood stated that he is familiar with Todd because he had been present on several occasions when Todd was arrested, and had stopped him while driving.  *Id*. at 4-5.

Todd's evidence calls into question Wood's version of the facts.  First, Story explained that, right after Todd was hit by the truck, "I was ordered to get down on the ground by an officer that I later discovered was Terry Wood, and he pointed his gun at me when he told me this."  Brandon Story Aff. (doc. no. 63-1) at 5.  "After he told me to get down," Story continued, "Terry Wood ran around the back of the club in the same direction that Merrill went in and he had a gun in his hand that looked like a shotgun."  *Id*.  Story further testified that he did not get down because the ground was muddy, but that

Wood continued past him anyway.  From this testimony, a reasonable jury could conclude that, upon arrival at the club, Wood immediately ran towards the back of the club where Todd was and that he was pursuing Todd because he saw him make a throwing motion.  Indeed, this pursuit could explain Wood's failure to stop when Story did not immediately get down on the ground.

A memorandum written by defendant Clark and made shortly after the events at issue also calls Wood's story into question.  In a memo dated three days after the incident, Clark wrote:  "Sgt. T.J. Wood led everyone there. ...  Once we turned into the parking lot, Sgt. Wood went towards the end of the building and I stopped in front of the front door.  I was the first one through the door followed by Officer Shepard and D/R Sevier and many more officers.  I was yelling for everyone to get on the ground, they all finally complied.  Once we had control of the scene inside I walked over towards the back door and was met by Sgt. Wood.  He had a clear bag

in his hand that contained marijuana, he handed it to me and said, 'We need to make sure this gets to the lab for fingerprints, because Merrill Todd threw it on the ground and took off running when he saw me.  And you might want to go out back because Steve hit Merrill with the truck.'" Clark Statement (doc. no. 63-2) at 4 (italics added).

Although not conclusive on this point, Clark's statement suggests that, contrary to Wood's statement, Wood did not enter the club until he came to the back door with the marijuana in his hand.  Based on Clark's statement, a jury could also conclude that Wood was not being truthful or forthcoming when he said he did not recognize Todd on the night of the event; according to Clark, Wood used Todd's name when he handed him the suspected marijuana.

Finally, Story's brother, who was in the club, saw Smith and Wood enter the club after Todd was injured, and brush hay off their pants.  Bryant Story Dep. (doc. no. 56-14) at 37:16-38:7, 60:17-61:22.  Defendants admit that

Todd was injured in an area strewn with hay.    In his
statement and declaration, Wood does not report kneeling
on the ground; his statements do not explain how he could
have gotten hay on his pants.    This evidence tends to
support Todd's contention that Wood was involved in
assaulting him.[18]

In sum, while there is no direct evidence that Wood
beat up Todd, there is evidence that upon pulling into
the parking lot, Wood trained his spotlight on Todd and
saw him run around the back of the building and make a
throwing motion as he ran; that Wood then took off after
Todd, carrying a large gun capable of inflicting the head
injuries Todd sustained; that Wood was in the area with
Todd immediately after he was hit by the truck; that
Story heard the sounds of a tussle coming from the area

---

[18]. Moreover, as the court will explain later, there
is circumstantial evidence that Smith was involved in the
beating of Todd; and, as explained earlier, there is
circumstantial evidence that Wood would have been present
during that beating.

where Wood ran; that Wood was seen after Todd was injured brushing hay off of his pants; and that Wood submitted an affidavit falsely denying that he recognized Todd at the raid. Combined with the previously discussed evidence from which a jury could conclude that Todd was subjected to a use of force, this evidence is sufficient for a reasonable jury to conclude that Wood either used force against Todd or was present and failed to intervene when someone else did.

### b. Clark and Bailey

The court discusses the evidence against Clark and Bailey jointly as it is largely the same. In their declarations, Clark and Bailey testified that they were assigned to obtain control of the persons inside the club, search them, and interview them. According to Clark, about ten minutes after the raid started, he was near the back door when defendant Wood gave him a bag of suspected marijuana and told him that Todd had been hit

by Steve Smith's truck.  When he went outside, Clark saw the ambulance crew working on Todd.  He then returned to the inside of the club, told Bailey about the accident, and continued to assist in processing the detainees. Clark denied striking Todd, deploying a Taser during the enforcement action, seeing anyone strike Todd or use a Taser, and seeing a dog at the scene.  *See* Clark Decl. (doc. no. 66-2).  However, Clark admitted to threatening to use a Taser against another person that night. *See* Clark Statement (doc. no. 63-2) at 5 ("I then turned my taser on and said Bryant, I'm trying to be nice and not cuff you, but if you don't get into the truck, I'm going to have to taze you.").[19]

Bailey reports that he was inside the club with ABC Agent Ken Smith searching and interviewing the people

_____

19. Interestingly, Clark's employer, the LaFayette police chief, attested that Clark would not have had a Taser on the night in question because Clark was employed as an investigator.  *See* Vines Decl. (doc. no. 53-14) at 4.  Clark seems to have carried one anyway.

when the back door opened and they saw an ambulance outside. They went outside and "learned that a LaFayette police department vehicle struck someone fleeing the club." Bailey Decl. (doc. no. 53-10). He later identified the person struck as Todd. After Smith told him that he had accidentally collided with Todd, Bailey called the police chief and said they would need to conduct an investigation into the accident. He then went back inside the club. Bailey denied using any force against Todd or seeing anyone else do so. Agent Smith corroborated Bailey's version of events.

Todd's primary evidence against Clark and Bailey is the testimony of witness Sasha Baker, who was in the club the night of the incident. Todd offers Baker's testimony to prove that Clark and Bailey were not in the club processing detainees, but instead were outside when Todd was injured and either hit him or did not intervene when another officer hit him.

In her deposition, Baker testified that, when the sweep began, a group of officers came through the front door of the club and ordered everyone to get down on the floor, which she did.  She saw Clark, then Bailey come in through the back door some time later; she remembered Clark was muscular, was wearing a head scarf, and holding a big gun in his hand.  When asked how much time passed before she saw Bailey come through the back door of the club, she said she was unsure: she estimated that it was a couple of minutes after the sweep began, but when a longer period was suggested by the examiner, agreed that it could have been as much as 15 or 20 minutes.  Baker Depo. (doc. no. 56-9) at 24:17-25:4.  She noticed that Bailey was sweating, and, on that basis, she thought that he might have been chasing someone.  *Id*. at 27:16-20.

In an affidavit submitted not long thereafter, Baker stated that, a few minutes after the raid began, she saw Clark and then Bailey "come through the back door

sweating and breathing hard like they were tired." Baker Aff. (doc. no. 63-1) at 3.

Another witness, Terrence Bledsoe, also testified to seeing a tall bald officer with a bandana on his head--presumably Clark--come in through the back door after the raid had started, holding a shotgun.

In addition, Todd offered evidence to show that Clark had animus against him. Todd stated that, during an interaction that occurred before the events in this case, Clark told Todd in a threatening manner with profanity to leave the county or move to Georgia.

This evidence is simply not enough for a reasonable jury to conclude that either Clark or Bailey was involved in beating Todd. As to the evidence against Clark, while both Baker and Bledsoe saw Clark come in through the back door of the club, their testimony does not exclude the possibility that Clark was simply returning to the club after going outside, as he maintained. Both witnesses were admittedly lying on the floor during the raid, so

they presumably could not see everything that occurred. Even if one infers from the evidence that Clark came in through the back of the club rather than from the front, there still is simply not enough evidence to determine whether he was in the area where Todd was beaten when he was beaten. Baker's testimony as to how much time passed before Clark and Bailey came in through the club's back door is too inconsistent to draw a firm conclusion as to when they entered, and Bledsoe's is not specific. Although Baker said Clark was sweating and breathing hard when he came back inside the club, this evidence is insufficient to say Clark had just come from Todd. And given that it was August in Alabama, his sweating (and perhaps even his breathing hard depending on his physical condition) is not particularly surprising. Clark was seen holding a large weapon or shotgun, but so were others at the sweep. Clark admitted to possessing a Taser on the night in question; however, because Todd did not present sufficient and admissible evidence showing that

the wound on his leg came from a Taser, Clark's possession of a Taser does not tie him to Todd's injuries. And while there is some evidence that Clark had expressed animus towards Todd on a prior occasion, the court has no way of assessing how far in the past that incident occurred, and Todd has offered no details as to the context in which the comment was made; therefore, its relevance is minimal. In sum, there simply is not enough evidence to hold Clark liable for Todd's injuries.

For much the same reasons, the court finds Baker's testimony insufficient for a jury to conclude that Bailey either beat or stood by and failed to intervene while others beat Todd. Without further evidence, a reasonable jury has no way to conclude whether Bailey was outside when Todd was injured and what, if any, role Bailey played in Todd's beating. Moreover, the evidence against Bailey is even weaker than the evidence against Clark: there is no evidence that Bailey was carrying a large gun that

could have been used to break Todd's bones or that he had expressed any malice towards Todd.

Furthermore, Bailey offered a statement that called into question Smith's version of events. It was Bailey who pointed out in his memo that Smith changed his story when asked what had happened to Todd; first he stated that Todd had fallen and hit his head on a rock, then only when asked a second time offered the story that he hit him with his truck by accident. It seems highly implausible that Bailey would have pointed out Smith's apparent lie if he had actually been involved in beating Todd and wanted to cover it up. Accordingly, the court will grant summary judgment for Clark and Bailey on the § 1983 claim.

### c. Evidence Not Considered

Before moving to the next section, the court pauses to discuss some evidence it found inadmissible or did not consider to be probative of Todd's claims.

As support for his claim against Clark and Bailey, Todd submitted an affidavit that he has been having dreamlike visions of Clark and Bailey beating him. In an affidavit, Todd attested:

> "...I don't really remember what happened that night. . . . But I keep seeing Larry Clark and Jerome Bailey hitting me. It's fuzzy, like pieces of a dream that I sometimes see off and on. My memory comes and goes like flashbacks."

Todd Aff. (doc. no. 63-1) at ¶ 3. Todd had previously testified that he could not remember anything about that night between seeing the lights of the truck and waking up in the hospital. Therefore, his affidavit testimony is akin to a recovered memory. *See generally* 7 Clifford S. Fishman & Anne T. McKenna, Jones on Evidence § 53:47 (2017).

Here, Todd's 'flashback' testimony is substantially more prejudicial than probative. As noted above, in the affidavit, Todd states that he does not "really" remember what happened to him, but that he keeps seeing visions of being beaten by Clark and Bailey "like pieces of a

dream," and characterizes these visions as his memory coming back. Todd's characterization of these visions as his "memory"--rather than as products of his imagination or suggestion--is an opinion that he is not qualified to give. Only expert testimony could elucidate whether these 'flashbacks' are likely pieces of Todd's memory, or something else entirely, but Todd has not presented any expert evidence. *Compare Shahzade v. Gregory*, 923 F. Supp. 286, 289 (D. Mass. 1996) (Harrington, J.) (admitting expert evidence regarding repressed-memory syndrome and allowing witness to testify to her recently revived memories of the defendant's alleged nonconsensual sexual touching 50 years earlier). Without the assistance of an expert to explain the likely provenance of these visions, the court--and the jury--would be left to speculate about what they are and whether they reflect actual events. Moreover, given the evidence that Todd's family members have told him he was beaten, it seems quite possible that the flashbacks are

a product of suggestion rather than a reflection of actual events. For these reasons, the flashback testimony poses a very substantial risk of confusing the jury, and carries limited probative weight. Because it has little probative value, and its probative value is significantly outweighed by the potential for prejudice, the court will not consider it here.[20] *See* Fed. R. Evid. 403.

Todd also stated that, a few months prior to the date of his affidavit, Clark apologized to him repeatedly,

---

20. Defendants also argued that the court should not consider the statements in Todd's affidavit about seeing visions of Clark and Bailey hitting him because, to the extent Todd is asserting that he actually saw these defendants strike him, they are a sham.

While Todd did not mention the flashbacks during his deposition, he did at one point testify that his memory seemed to be starting to come back. Also, it is possible that he began having the flashbacks only after his deposition. In addition, given Todd's admission in his affidavit that he cannot really remember what happened, Todd's affidavit is arguably not in direct contradiction to his earlier deposition testimony. Because there was only a possible inconsistency, the court did not disregard the statement as a sham.

although Clark did not admit to beating him.   Todd's
affidavit   provides   no   details   of   the   conversation
indicating that Clark was apologizing for having beaten
Todd--as opposed to saying something along the lines of
"I'm sorry you ended up being injured."   Given the lack
of context, Todd's statement about Clark's apology is too
ambiguous to offer support for his claim.

Also, during his deposition, when asked what he
remembered about the night he was injured, Todd testified
that he remembered being in the parking lot and seeing
the truck's lights, then waking up in the hospital and
saying Clark's name and seeking a gun.[21]   Todd argues that
his testimony that he woke up in the hospital saying
Clark's name and seeking a gun supports his contention

_____

        21. Todd initially testified to waking up in the
hospital and saying both Bailey's and Clark's names and
seeking a gun.   He then corrected himself and said he
could really only remember saying Clark's name.   The
court obviously cannot consider this evidence against
Bailey given Todd's retraction of his initial statement
implicating Bailey.

that Clark attacked him. The statement, while admissible, proves little. Todd could have said Clark's name because he was having a dream about Clark, with whom he had had a prior negative interaction.

Todd also offered the statements of various witnesses opining that Bailey and Clark are 'dirty cops' or that they have used excessive force in the past. Testimony that Clark and Bailey are 'dirty cops' is not admissible to show that they probably beat Todd because it is evidence of their character or a character trait and it is offered "to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Testimony as to prior incidents of excessive force is not admissible either here: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* Evidence of prior bad acts "may be admissible for another purpose, such as

proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Todd has made no showing that any of these exceptions apply to past allegations of excessive force not involving Todd, and the court sees no reason to conclude that any do.

Todd argues that the court should consider the 'dirty cop' evidence as reputation or opinion evidence as to character. Federal Rule of Evidence 608 provides that, "A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a). Todd did not present affidavits or testimony speaking to Clark or Bailey's 'character for truthfulness.'[22] Accordingly, the court did not consider the evidence.

_____

22. While testimony that an officer is reputed in the community to plant drugs on suspects could go to the

4. Reasonableness of Use of Force

Whether Wood's conduct violated Todd's constitutional rights depends on whether his actions were "objectively reasonable" in light of the circumstances confronting him. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts examining the objective reasonableness of a particular application of force consider "the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002). At bottom, these considerations equate objective reasonableness with the requirement that the force used in an arrest be "reasonably proportionate" to its need. *Id.* In determining the need for force, courts consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the

officer's reputation for truthfulness, Todd did not present this testimony in an admissible form.

safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Here, the crime at issue was not particularly severe. While the crimes that brought the officers to the club were misdemeanors, Wood saw a person--presumably Todd--make a throwing motion before running after him, so Wood may have viewed Todd as having discarded drugs or other contraband. That said, when Todd was running from the club, no information suggested he posed a threat to anyone; he was not armed nor was there any indication that he had committed a violent crime; no one claimed to recognize him as a violent criminal. Todd was evading arrest when Smith struck him with his truck, and Fuller states that Todd began to resist and was not compliant when he tried to keep him on the ground. However, there is no evidence that Todd threatened or struck anyone.

Taking these facts into account, and viewing the evidence in the light most favorable to Todd, the force

used against Todd was disproportionate to its need. Judging from his injuries, Todd was hit in the head with a hard object forcefully enough to break his skull. He also received other unexplained injuries and damage, including the open wound on his thigh that required stitches and the torn boot and ankle. There is no evidence that Todd's resistance was such that the officers needed to beat him severely to gain compliance or avoid danger to themselves or others. While some physical coercion may have been needed to hold him until the ambulance arrived, this purpose would not justify beating him with the force to break his skull. Thus, the court concludes that a reasonable jury could find that Wood used unreasonable force against Todd.

### 5. Qualified Immunity

Having determined that there is adequate evidence to conclude that Wood violated Todd's constitutional rights, the court turns to the issue of qualified immunity.

Qualified immunity protects government actors from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Its applicability hinges on whether the officials' conduct was objectively reasonable in light of clearly established law. *Id.* at 818.

### a. Scope of Discretionary Authority

To receive qualified immunity's protection, a government agent must show he was acting within the scope of his discretionary authority at the time of the wrongful-conduct alleged. *See Lee v. Ferraro*, 284 F.3d 1188, 1192 (11th Cir. 2002). Here, Wood was performing a sweep of a club selling alcohol without a liquor license. This involved searching and securing the club, including temporarily detaining those on the premises. Because these are basic officer duties, the court finds that Wood was acting within the scope of his

discretionary authority at the time of the encounter with
Todd.

Ordinarily, the next step in the qualified-immunity
analysis is an assessment of whether the plaintiff has
alleged a violation of a constitutional right. Here, the
court has already addressed that issue. Accordingly, the
only remaining issue is whether that right was clearly
established at the time of the incident such that a
reasonable officer should have been on notice that his
conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223,
232 (2009); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).


### b.  Clearly Established Law

Wood will be required to defend himself at trial only
if the law at the time of the incident clearly established
that his alleged conduct violated Todd's constitutional
rights.  In so determining, "the relevant, dispositive
inquiry ... is whether it would be clear to a reasonable
officer that his conduct was unlawful in the situation

he confronted." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). There are three ways that a plaintiff may show that a right was clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016).

While Todd has not identified any other cases in which an officer is alleged to beaten a person so severely as to crack his skull when that person was apparently unarmed, on foot, fleeing the scene of a bust for a misdemeanor liquor offense, and possibly attempting to avoid arrest for drug possession, the unconstitutionality of such conduct is plain. The state of the law on August 7, 2010, was such that a reasonable officer would have

known that beating Todd with the force evidenced from his injuries, while he was offering only limited resistance, not attempting to strike at the officers, and attempting to flee on foot from arrest for a non-violent offense, was gratuitous and unlawful. Wood, therefore, is not entitled to qualified immunity at this stage.

## B. Todd's State Claim

Todd sues Bailey, Clark, Wood, and Smith for battery under Alabama law. In response, Woods and Clark contend that they are entitled to absolute immunity, while Bailey and Smith contend that they are protected by state-agent immunity. All four defendants also argue that there is insufficient evidence to hold them liable.

### 1. Absolute State Immunity

Alabama guarantees absolute immunity for its executive officers. Under well-settled state law, sheriffs and, by extension, their deputies, are

considered executive-level state officers immune from suit in both their official and personal capacities for actions within the scope of their employment. *See Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996); *Ex Parte Donaldson*, 80 So. 3d 895, 897-900 (Ala. 2011).[23]

Wood was a sheriff's deputy at the time of Todd's purported beating and asserts his absolute immunity from suit as ground for summary judgment on Todd's state claim. The court will grant summary judgment to Wood on Todd's state claim against him.

Although Clark was paid by the City of LaFayette, he too invokes absolute immunity. Clark argues that at the time of the raid, he was functioning as a deputy sheriff and, accordingly, is entitled to immunity. Todd argues that because Clark worked under the supervision of the

---

23. There are only limited exceptions to the application of absolute state immunity, and they do not include suits for monetary damages. *Parker v. Anderson*, 519 So. 2d 442, 443 (Ala. 1987). As Todd's suit is for compensatory and punitive damages only, the exceptions do not apply.

city of LaFayette and was paid by LaFayette, he should be considered a city law enforcement officer for the purposes of this litigation and should be denied absolute immunity.

Clark was deputized as a deputy sheriff when he joined the city-county drug task force. The agreement establishing the task force provides, in relevant part:

> "6. REQUIREMENT FOR PARTICIPATION OF OFFICERS. Each certified police officer provided by Lanett, Lafayette and Valley will also be deputized as a Deputy Sheriff of Chambers County, Alabama by taking an Oath of Office. ... It is the intention of the members that every task force officer becomes an extension or alter ego of the Sheriff of Chambers County, Alabama thus affording him or her the immunity provided under Article V, Section 112 and Article 1, Section 14 of the 1901 Constitution of the State of Alabama."

Task Force Contract (doc. no. 66-3) at 6. By participating in the county-city task force, Clark thus became an alter ego of the Chambers County Sheriff. Nonetheless, Todd argues that, because Clark was still paid by LaFayette and was still a city officer, he should

not be granted executive-officer immunity. The Supreme Court's decision in *McMillian v. Monroe County, Ala.*, 520 U.S. 781 (1997), cautions against Todd's suggested approach. There, the Court held that, even though sheriffs are paid from the coffers of their respective counties, they are considered state officers when acting to enforce state laws. *Id.* at 791, 793; *see also Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1527 (11th Cir. 1990) (same).

In this case, the record shows Clark was participating in a task-force action during Todd's alleged assault. Indeed, he used the task-force letterhead to give his statement on August 9, 2010, two days after the incident. The letterhead bears a seal reading "Drug Task Force: Chambers County," and Clark signed the statement, "Inv. Larry Clark - DTF." Clark Statement (doc. no. 66-4) at 1-2. The court is satisfied that Clark was "acting in the line and scope of his employment" as a Chambers County deputy at the time of

Todd's assault.  Clark is therefore entitled to absolute state immunity for the state claim against him; his motion for summary judgment will be granted on this ground.

For the reasons discussed in reference to the § 1983 claim, Clark is entitled to summary judgment in his favor on the merits as well.


## 2. State-Agent Immunity

Bailey and Smith, while not entitled to absolute immunity as state officers, contend that they are entitled to state-agent immunity.  State-agent immunity "protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities."  *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002).  The Alabama Supreme Court has described the contours of its state-agent immunity doctrine, in relevant part, as follows:

> "A State agent *shall* be immune from civil
> liability in his or her personal capacity when
> the conduct made the basis of the claim against
> the agent is based upon the agent's...
> exercising judgment in the enforcement of the
> criminal laws of the State, including, but not
> limited to, law-enforcement officers' arresting
> or attempting to arrest persons....
> Notwithstanding anything to the contrary in the
> foregoing statement of the rule, a State agent
> *shall not* be immune from civil liability in his
> or her personal capacity... when the State agent
> acts willfully, maliciously, fraudulently, in
> bad faith, beyond his or her authority, or under
> a mistaken interpretation of the law."

*Ex Parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)

(emphasis in original).  The defendant bears the initial

burden of showing that at the time in question, he was

acting pursuant to an immunized function; the burden then

shifts to the plaintiff, who must show the defendant is

not immune because he acted "willfully, maliciously, in

bad faith, or beyond his or her authority."  *Grider v.

City of Auburn, Ala.*, 618 F.3d 1240, 1255 (11th Cir.

2010) (citing *Ex parte Estate of Reynolds*, 946 So. 2d

450, 452 (Ala. 2006)).

### 3. Battery: Bailey and Smith

In the motions for summary judgment, Bailey and Smith argue that (1) there is insufficient evidence of battery for the claim to proceed to trial and (2) they are entitled to state-agent immunity from Todd's battery claim.

To preclude summary judgment on the battery claim, there must be sufficient evidence in the record for a jury to conclude: (1) that the officers touched Todd; (2) that they intended to touch him; and (3) that the touching was done "in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d. 1190, 1193 (Ala. 1998) (citing Restatement (Second) of Torts § 18 (1965)).

As discussed in relation to Todd's § 1983 claim, there is not enough circumstantial evidence in the record to warrant a jury finding Bailey was involved in beating Todd. Accordingly, the court will grant summary judgment in favor of Bailey for insufficiency of the evidence.

Todd argues that Smith committed a battery when he hit him with his truck. Smith concedes that he hit Todd with his truck, but argues that there is no evidence that he did so intentionally. The court disagrees. Smith acknowledged that his purpose in circling the club with his truck was to stop people, such as Todd, who attempted to evade the law enforcement sweep. In his statement, the officer riding with Smith recalls Smith saying, "there's a runner," before he hit Todd. Fuller Statement (doc. no. 63-3) at 10. Story also testified that Smith accelerated before hitting Todd:

> "Q. Did they accelerate to try to hit him?
>
> "A. Yes, sir. He was flying in the back part.
>
> "Q. Okay. How do you know they accelerated?
>
> "A. Because I can hear the motor revving up.
>
> "Q. Motor revved up to try to hit him?
>
> "A. Yes, sir."

Brandon Story Dep. (doc. no. 56-8) at 93:14-22. Moreover, Story testified that, contrary to Smith's

contention, Todd did not slip and fall in the path of Smith's truck before he was hit. When asked by Bailey what had happened to Todd, Smith initially said he hit his head on a rock, then, when confronted with the absence of a rock, said it was an accident.

Finally, although Smith reportedly was aware at the time of the accident that he had hit Todd with his truck, there is evidence that neither Smith nor the other officers present mentioned this truck accident to the paramedics who came to the scene to treat Todd. In the report Smith wrote shortly after the incident, he explained: "I saw the subject trying to get up when my truck struck the subject. I came to a stop and jumped out my vehicle. Deputy Jason Fuller and I went to check on the subject. I saw the male subject bleeding from his head so I called EMT to the scene." Smith Report (doc. no. 63-2) at 9. In other words, he was already aware that he had hit Todd with his truck before he called EMS. However, based on Lafeyette EMS's report on the incident,

it appears that Smith said nothing to them about having hit Todd with his truck when he called for EMS. In the report on the incident, LaFayette EMS stated that they were called to the scene for an unknown problem. *See* EMS Report (doc. no. 63-2) at 2, (doc. no. 53-25) at 4 ("LaFayette EMS received a 911 call to the above location in ref. to an unk. problem."). Furthermore, when the paramedics arrived to treat Todd, the officers did not tell the paramedics about the truck hitting Todd, instead saying they were "unsure" how Todd was injured and that Todd had run out the back door and fallen down. *Id.*[24] Indeed, the EMS report contains nothing about Todd being hit with a truck. A reasonable jury could infer that,

---

24. The report says: "LaFayette EMS received a 911 call to the above location in ref. to an unk. problem. O/A found the pt. laying face down on the ground behind the building in hand cuffs. W/the police searching him. As we approached the pt. we asked what had happened. The officers who were searching him, said they were unsure, that the pt. had run out the back door and fallen, when they got to him, they said he was trying to fight w/them, so they handcuffed him, and when they rolled him over he was bleeding from his face." *Id.*

if the collision were truly an accident, the officers present would have told the paramedics about it, as that information could affect the medical care Todd received, and that they did not tell the paramedics because they were covering up something worse than an accident. In sum, there is sufficient evidence to create a genuine dispute of material fact as to whether Smith hit Todd intentionally with his truck.

This evidence is also sufficient to create a genuine dispute as to whether Smith was involved in the purported beating of Todd. As discussed earlier, Story's testimony disputing Smith's account of the accident is sufficient to create a genuine dispute as to whether Todd was beaten by law enforcement, and there is more than sufficient evidence to conclude that Smith was present with Todd when the alleged beating occurred. Furthermore, Story's brother testified that when Smith and Wood came in to the club after Todd was injured, they were both brushing hay off of their pants. Bryant Story Dep. (doc. no. 56-14)

at 37:16-38:7, 60:17-61:22.  A jury could conclude based on the evidence of Smith's shifting stories about how Todd was injured, and the other circumstantial evidence discussed above (including evidence that Smith hit Todd intentionally with his truck), that he was involved in beating Todd or at least assisted those who did.  *See* 6A C.J.S. Assault § 16 ("liability for an assault or assault and battery is not necessarily restricted to the actual participants; any person who is present, encouraging, or inciting an assault and battery by words, gestures, looks, or signs, or who by any means approves the same, is in law deemed to be an aider and abettor and liable as a principal, and such person assumes the consequences of the act to its full extent as much as the party who does the deed.").  As such, Smith's argument that the evidence is insufficient to support the battery charge fails.

Finally, Smith cannot receive state-agent immunity for his use of force against Todd.  The facts, viewed in

the light most favorable to Todd's claim, show Smith acted willfully and in bad faith.[25]    Assuming Smith hit Todd with his truck intentionally or was involved in beating Todd to the point where he suffered a broken skull or both, he would not be entitled to state-agent immunity.

## IV. CONCLUSION

The record in this case does not provide clear answers to exactly how Todd was injured.  For example, the wound on his leg is suspicious, and may indeed have

---

25. Bailey and Smith argue that Todd failed to carry his burden of showing that an exception to state-agent immunity applies.  It is true that Todd did not directly address the state-immunity argument in his brief. However, at the time briefs were filed, Todd was represented by counsel who has since been suspended from the practice of law for incompetence for several years; the court is loathe to penalize him for his attorney's obvious incompetence.  In any case, the evidence Todd provided on the merits of his claim is sufficient to establish the applicability of an exception to the immunity rule.

been caused by a Taser, but Todd has not presented sufficient evidence to show that it was so caused.  He also has failed to present sufficient evidence to survive summary judgment against two of the remaining defendants. However, there is sufficient evidence for a reasonable jury to find that that Smith intentionally hit him with the truck, or that Todd was beaten and defendants Wood and Smith were involved in the beating, or that both events occurred.  Accordingly, the court will allow him to go to trial on his federal claim against Wood and his state claim against Smith.

An appropriate judgment will be entered.

DONE, this the 6th day of April, 2018.

                              ___/s/ Myron H. Thompson___
                              UNITED STATES DISTRICT JUDGE